(No. 33349.—

THE CITY OF CHICAGO, Appellant, *vs.* ILLINOIS COMMERCE COMMISSION *et al.,* Appellees.

*Opinion filed November 18, 1954—Rehearing denied Jan. 18, 1955.*

JOHN J. MORTIMER, Corporation Counsel, of Chicago, (JOSEPH F. GROSSMAN, and PATRICK W. DUNNE, of counsel,) for appellant.

LATHAM CASTLE, Attorney General, of Springfield, (HARRY R. BEGLEY, of counsel,) for appellee Illinois Commerce Commission; KENNETH F. BURGESS, DOUGLAS F. SMITH, LESLIE N. JONES, FRANK R. REID, GORDON W. WINKS, HOWARD J. TRIENENS, and RICHARD L. SELLE, (SIDLEY, AUSTIN, BURGESS & SMITH, of Chicago, and REID, OCHSENSCHLAGER & MURPHY, of Aurora, of counsel,) for appellee Illinois Bell Telephone Company.

Mr. JUSTICE DAILY delivered the opinion of the court:

This is an appeal by the city of Chicago from an order of the circuit court of Kane County, affirming an order of the Illinois Commerce Commission, entered April 15, 1953. The Commission order was one granting an increase in telephone rates to the Illinois Bell Telephone Company, and was entered in obedience to a mandate from this court issued pursuant to this court's decision reported in *Illinois Bell Telephone Co. v. Commerce Com.* 414 Ill. 275. The earlier proceedings in the case, which were extensive, are adequately described in that opinion and there is no occasion for restatement here.

In the order here appealed from, the commission found that the present fair value of the company's property devoted to the telephone service here involved is $586,000,000; that a proper rate of return on this value is 5.2 per cent; and that the company should file new rate schedules reflecting the rate increase of approximately $16,500,000 resulting from these findings.

The city objects to the fact that the commission did not hear additional evidence beyond that which was before

it when it entered the order covered by our previous opinion in the cause. The mandate of this court, however, did not require it to hear additional evidence. This court, in its opinion, stated simply that "It is the Commission's duty, * * * to reconsider the record in this case, to hear *such additional evidence as may be necessary,* and to enter findings and conclusions, all in accordance with the views expressed in this opinion." (Emphasis supplied.) It is suggested that Western Electric Company, from which the telephone company buys much of its equipment, in 1952 made reductions in its prices of about 18 per cent. It is also suggested that two substantial wage increases were made by the company in 1952 and 1953, as well as $50,000,000 of plant additions, and that costs of construction increased between the commission's earlier order and its order of April, 1953. Since none of these matters appears of record, this court cannot be influenced by any of them. If there was any error in fact, that error has not been established.

The city, objecting to the 5.2 per cent allowed by the commission as a rate of return, seems to argue, if we understand the argument correctly, that the commission having previously found that 4.87 per cent was a proper rate of return, could not properly find later on the same evidence that 5.2 per cent was proper. It says that "The Commission was powerless under the Supreme Court decision to deviate from its former finding that a fair rate of return on the dollar was 4.83 per cent, but under the mandate of the court, the Commission was bound to apply such rate of return on the basis of the fair value of the utility property." The city further states that "the only basis for the judgment of the Supreme Court in this case was that the Commission, in its order of December, 1951, erred in applying the rate of return which it found to be fair on the Company's investment instead of the present fair value of the property." This statement betrays a misreading of this court's opinion and mandate. The opinion, correctly

read, holds that the commission had erred both as to the basis upon which it found property value and also as to the rate of return. As to property value, the error consisted in the ignoring by the commission of current economic conditions. As to the rate of return, the error arose out of reliance by the commission on a certain "interest plus dividends" formula which was put into the record by a commission witness. The city's argument is, in effect, that this court, in vacating the commission's previous order, directed the commission to repeat one of the very errors for which it vacated the order. Beyond the above argument, which we find to be entirely unfounded, the city offers no support for its objection to the 5.2 per cent found by the commission. The rate of return of 5.2 per cent was one which the commission in its earlier order had found that the company was earning on net original cost under then existing rates, which the commission refused to disturb, but which, on the contrary, it found to be just and reasonable. The commission thus, by necessary implication, had already found a return of 5.2 per cent to be reasonable, and nothing in our previous opinion was intended to, or did, impugn that finding. The findings which this court there regarded as erroneous were those which stated that a fair rate of return on net original cost was 4.83 per cent, and that a fair rate of return on fair value was 4.6 per cent. Those findings were based on the application of the "interest plus dividends" theory which we condemned, pointing out that the theory related to invested capital and not to fair value. We continue to adhere to that conclusion. Under the facts disclosed by the record in this case with regard to values and economic conditions, a rate of return of 5.2 per cent appears both reasonable and proper and we find no basis upon which the city can properly criticize it.

The remainder of the city's argument consists, for the most part, in an attack upon the portion of our former

opinion which adhered to the rule that the rates of this utility must earn a return upon the present value rather than on the original cost of its property. In support of its argument, the city cites and quotes extensively from the case of *Utah Power & Light Co.* v. *Public Service Commission,* 107 Utah, 155, 152 Pac. 2d 542, and copies much of the opinion in that case, as an appendix to its brief. It will suffice to say that the law of the State of Utah as expounded in that opinion does not comport with the law of the State of Illinois as shown by the opinions of this court. The Supreme Court of Utah held in substance, in that case, that all previous decisions of that court and of the Public Service Commission of Utah applying the present value rule in utility rate cases had been based wholly upon a construction of the due process clause of the Federal constitution, and not in any degree upon an interpretation of the statute of Utah creating the commission. It is not so in Illinois. For many years, this court has ruled that it is the duty of the Illinois Commerce Commission and its predecessor commissions, under the Public Utilities Act of this State, to allow a proper return upon the present fair value of utility property. In the previous opinion in this case, we referred to the leading case of *Public Utilities Com.* v. *Springfield Gas and Electric Co.* 291 Ill. 209, and said (414 Ill. at pp. 288-289) : *"In construing the statute* this court held that the Commission must use a rate base which represents the present fair value of the utility property, arrived at after full and proper consideration of reproduction cost, and a reasonable return, based upon an appraisal of the opportunities available for investment in other enterprises."  (Emphasis supplied.)

Though some jurisdictions have tended to vacillate on the question of the meaning of the Federal constitution as applied to public utility rates, a like vacillation on the part of this court is not reflected in its construction of the Public

Utilities Act of this State. The language of Judge Learned Hand in *Consolidated Gas Co.* v. *Newton,* 267 Fed. 231, pp. 237-238, sets forth well the economic basis for that construction and is worth extensive quotation. He said: "The recurrent appeal to a just rate and a fair value assumes that the effort is to insure such a profit as would induce the venture originally and that the public will keep its faith so impliedly given. * * * By insuring such a return it is assumed that the supply of capital will be secured necessary to the public service. * * * It is true that individual misfortunes cannot be foretold, and these a given company must bear, just as any single competitive venture would have to bear them. Among these, however, is not a general rise in prices, which, affecting all alike, at least after a time, enables each to raise his price, not only because of his costs in labor and in materials, but to obtain a proportionate increase in his profit, based upon the increased value of his plant and machinery. All competing producers who give the same service must keep invested an increased number of dollars in capital to do so. The risk of the depreciated dollar is not one which industry in general will bear; it is, indeed, no risk at all. Moreover, a profit based upon the enhanced value of the capital adds nothing in truth at all to the company's wealth. Though its capital be measured in more dollars, and so, too, its profit, that profit is still paid in the fallen dollar, and has no greater buying power than it had before. The increased valuation of the capital will for the years of the depreciated dollar leave the company exactly as it was; it will merely prevent its being compelled to share its putative fair profit with its customers, which by hypothesis it should not be asked to do. The company gains nothing; the customers lose nothing. * * * There is a natural enough reluctance to a continuous reappraisal of plants, and properly so. It must, of course, appear that the variation in prices is not

transitory, and the period of probation before a company is allowed relief is precisely to insure against that possibility. The chance of loss during that period such companies must endure, and there is an inevitable 'lag' in readjustments in each direction. But, once it appears that the new price levels are not transitory, it is no answer to the company's complaint to say that at some future time prices may fall. When that time comes, if it does, the property must again be revalued; but meanwhile they are entitled to some protection, and since these have become questions for the courts, to the protection of the courts."

The unwillingness of some to accept a rule taking original cost as the basis of rate-making value in a time of economic depression, as illustrated by the arguments in *Smyth* v. *Ames,* 169 U.S. 466, and *Steenerson* v. *Great Northern Railway Co.* 69 Minn. 353, 72 N.W. 713, shows the economic unsoundness of that rule. It is easy enough to see that in the event of a drastic reduction in price levels, a commission which had committed itself to the original cost rate base theory would be required to prescribe an unrealistically low rate of return on the artificially high rate base in order to maintain a structure of rates not entirely out of line with prevailing economic conditions. It is equally clear that in a period of inflation such as this country has had through the last decade, an original cost rate would require either an unjustifiably high rate of return or financial atrophy of the utility.

The decision of the circuit court of Kane County, affirming the commission's order, was right, and is affirmed.

*Order affirmed.*